Filed 7/27/22

# CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MONICA NUNEZ, | B308741 |
| Plaintiff and Appellant, | Los Angeles County Super. Ct. No. BC695847 |
| v. | |
| CITY OF REDONDO BEACH, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Thomas D. Long, Judge. Affirmed.

Mardirossian Akaragian, Garo Mardirossian, Armen Akaragian and Adam Feit for Plaintiff and Appellant.

Michel & Associates, C.D. Michel, Joseph Di Monda and Alexander A. Frank for Defendant and Respondent.

_____

* Under California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts 1, 3, and 4 of the Discussion section.

Monica Nunez appeals from the judgment entered against her after the trial court granted the City of Redondo Beach's (City) motion for summary judgment of her personal injury lawsuit. Nunez suffered injuries after she tripped on an elevated sidewalk slab within the City. The trial court dismissed her lawsuit after concluding the defect in the sidewalk was trivial as a matter of law, with no aggravating factors, and thus nonactionable under Government Code section 830 et seq.[1] We agree with the trial court and affirm the judgment.

## FACTS AND PROCEDURAL BACKGROUND

### 1. *The parties and underlying incident*

Nunez is the Vice President of Finance and Accounting at a restaurant chain, as well as a part-time fitness instructor for a gym. On February 25, 2017, Nunez went for a group run on Redondo Beach. At about 10:45 a.m., Nunez—wearing her running shoes—walked back to her car on a public sidewalk along the west side of South Catalina Avenue near or in front of the residence at 1003 South Catalina Avenue, Redondo Beach. As she was walking, her back foot hit a raised sidewalk slab causing her to trip and fall forward to the ground. Nunez landed on her left knee and right arm, fracturing her kneecap and elbow.[2] At the time of the incident, Nunez was in her early forties. The City is the municipal entity responsible for the sidewalk where Nunez tripped and fell.

---

[1] Undesignated statutory references are to the Government Code.

[2] Nunez fractured her "radial head" and "coronoid process." The fractures required surgery.

On February 28, 2018, Nunez sued the City,[3] alleging causes of action for dangerous condition of public property under section 835, negligence under section 815.2, and failure to perform a mandatory duty under section 815.6.

2.     ***The City's motion for summary judgment***

After answering the complaint, the City filed a motion for summary judgment on the ground the raised sidewalk slab was a trivial defect as a matter of law, and Nunez failed "to testify to or adduce any evidence that aggravating circumstances existed" to raise a triable issue as to the trivial nature of the defect.  In support of its motion, the City submitted the declaration of Frank Contreras, the City's Public Works Manager – Streets/Sewer & Storm Drains, who oversees the maintenance and repair of sidewalks in the City, including where Nunez fell.[4]

After the City received notice about Nunez's lawsuit, Contreras visited the area where Nunez fell.  He "quickly noticed" one segment of the sidewalk appeared defective. He measured "the displacement," which he declared ranged from zero "to 5/8ths of an inch, perhaps a millimeter more," and took a photograph.  Contreras saw no other defects in the sidewalk, "such as cracks, jagged edges, holes, loose concrete, or anything other than the height displacement."  Based on Contreras's review of the City's records, there had been no earlier

---

[3]     Nunez also sued the County of Los Angeles and Vazmenka Milovic, who allegedly maintained the property adjacent to the sidewalk.  They are not parties to this appeal.

[4]     Contreras held that same position when Nunez tripped in February 2017.

3

complaints, notices, or lawsuits involving the same sidewalk defect.

The City also submitted Nunez's deposition establishing that when she fell it was sunny, not dark or gloomy, she had nothing in her hands and was "normal walking, . . . looking ahead," and she did not see the sidewalk defect while she was walking. Nunez also testified she exercised at the beach every Saturday but had never walked through the area where she tripped because she usually parked on a different street.

After Nunez fell and "a while of l[y]ing there," she looked to see what caused her to trip and fall and saw that the corner of the sidewalk was raised. There was no liquid or sand on the sidewalk. She remembered there was a tree near the defect but did not recall seeing any branches or mulch or whether there were a lot of leaves in the area. Nor did she recall seeing any holes or chasms.

The City also submitted a black and white photograph, produced by Nunez's counsel during discovery, of the sidewalk with a circle drawn around two adjacent slabs in the row of slabs farthest from the street.[5] Nunez confirmed the circle encompassed the general area where she fell and that the corner—where the north slab met the south slab—was raised.

### 3. *Nunez's evidence in opposition to the City's motion*

In opposition to the City's motion, Nunez presented medical records, declarations from two forensic engineers, photographs of the incident scene, excerpts from the deposition of a City employee and her own deposition, as well as her own declaration.

---

[5] The sidewalk consisted of two rows of slabs—one adjacent to the street and the other adjacent to property.

4

On March 30, 2017, Benjamin Molnar, a forensic engineer at the safety and liability consulting firm Nunez's counsel retained, inspected the sidewalk where Nunez fell "under substantially similar lighting conditions to that which existed at the time of the incident." He took photographs and measurements of the sidewalk and attached photocopies of the photographs to his declaration. Molnar did not declare at what time of day he took the photographs, and there is no time stamp on the copies he attached.

The photographs Molnar took show the sun is shining and shadows—from a tree—are falling across the left side of the sidewalk, where it is raised. Photographs of a ruler next to different points along the offset measure the height differential at just under three-quarters of an inch,[6] about 9/16ths of an inch, and about a half-inch. A shadow from the tree appears to cover the three points measured.

Mark J. Burns—a senior forensic engineer at the same firm and Nunez's retained safety and liability expert—reviewed the March 2017 photographs and measurements Molnar took.[7] Burns also personally visited the site on February 14, 2020. Based on the photographs Molnar took, which Burns grouped and labeled as an exhibit to his declaration, Burns opined that the sidewalk uplift that caused Nunez's fall "presented an abrupt height differential of approximately 11/16 inches." Burns cited human ambulation studies that have shown "the minimum toe clearance of a pedestrian . . . during normal walking stride is

---

[6]     From our view, the ruler appears to measure the lift at 22/32nds of an inch high, or 11/16ths of an inch.

[7]     Molnar no longer worked at the firm.

approximately 0.50 to 0.60 inches."  He explained one study also "relat[ed] an unseen one-inch . . . height differential to a trip occurring on almost every stride.  Therefore, any abrupt height differential in excess of this magnitude has the substantial possibility of causing a pedestrian to trip and fall or misstep if the height differential is not conspicuous and readily observable in advance."

Burns opined the "subject height differential presents a substantial risk of injury because it would have been difficult to perceive at the time of the incident."  Burns noted (1) "the subject height differential was high enough to cause a trip event, but low enough that it would not be in plain sight"; (2) "there was no color or texture differentiation between the concrete slabs forming the height differential," further concealing its existence; and (3) astronomical data, in conjunction with the scene photographs from March 2017, "indicates that shadows cast on and around the subject defect from the adjacent tree(s), obscure the hazard."  Burns thus concluded that "[s]ince there is a height differential higher than the average minimum toe clearance of pedestrians during normal ambulation, and an obscured hazard that is not readily apparent, . . . the height differential and surrounding area pose a substantial risk of injury for pedestrians acting in a reasonable manner, and thus constituted a dangerous condition of public property at the time [of the] incident."

Michael Klein, the deputy director of Operations and Public Works, testified as the City's person most knowledgeable on designated topics.  The City's Public Works Department is responsible for sidewalk maintenance—including fixing uplifts or side shifts in sidewalk concrete.  A " 'lift' " or an "offset" is where "one panel is lifting higher than the adjacent panel next to it."

6

The City ground down sidewalk offsets as part of its sidewalk maintenance and repair work. In December 2019, however, it contracted with a company to grind sidewalk areas the City identified as needing repair. That contract provides the contractor will "eliminat[e] sidewalk tripping hazards by grinding or saw cutting concrete sidewalk panel offsets between the heights of 1/2 inch and 1-1/2 inches." Klein confirmed the City engineer set the criteria.

Before the incident, City employees inspecting sidewalks were instructed to note, in essentially a repair log, any offsets a "half inch or more." Klein explained that repair standard "could be" in part to eliminate a tripping hazard, but also because the City "like[d] to have even sidewalks around here, whether it's a tripping hazard or not." He did not know if the City ever had inspected the subject sidewalk before Nunez fell. But, if the three-quarter inch offset on the sidewalk where Nunez fell had been seen or reported, Klein "would expect that someone through [the City's] work order system" would have fixed it. Klein confirmed the City's sidewalk maintenance grinding crew had since ground down the offset on March 2, 2018, after receiving notice about Nunez's claim.

In a declaration signed February 25, 2020, Nunez attested she "tripped on a defect on the left side of the sidewalk that was obscured from my view, including as a result of shadows, and fell." She also declared that, when she fell, "I had occasion to observe the area where I fell, including the light conditions, shadows, and general condition of the area." She attached two photographs that she declared "fairly and accurately depict the conditions observed at the location and time of my fall."

7

The photographs appear to be copies of two of the photographs Molnar took on March 30, 2017.

Nunez argued the offset constituted a dangerous condition under the City's policy that offsets half of an inch or greater were tripping hazards needing repair, and aggravating circumstances existed here—the existence of shadows, "with the continuity of the walking surface color[,] shrouded the defect," and Nunez was unfamiliar with the area—that substantially increased the risk that Nunez would fall.

### 4. *The trial court's ruling*

In advance of the September 4, 2020 hearing on the City's motion, the court issued a tentative ruling granting the motion. Both the City and Nunez had filed several evidentiary objections. The court sustained the City's objection to Burns's declaration, as an improper opinion, to the extent Burns opined that the sidewalk defect posed "a substantial risk of injury for pedestrians acting in a reasonable manner," and that it constituted "a dangerous condition."[8] The court found Burns's other statements were appropriate factual conclusions for it to consider. The court also overruled the City's lack of foundation objection to Molnar's declaration, and the photographs attached to it, finding a proper foundation had been established.

The City also objected to Nunez's declaration that the sidewalk defect "was obscured from my view, including as a result of shadows," on the ground it contradicted her deposition testimony and must be disregarded under *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1 and *Villanueva v. City*

_____

[8] Nunez does not challenge this, nor any, of the trial court's evidentiary rulings.

8

*of Colton* (2008) 160 Cal.App.4th 1188.  The City argued Nunez had never mentioned—in her deposition or written discovery responses—that shadows obscured her view of the defect.  In overruling the City's objection, the court explained the deposition testimony the City cited did not directly contradict Nunez's declaration.  She did not, for example, testify "there were no shadows at all."  The Court noted Burns's testimony that—based on his review of the astronomical data—"shadows would have been cast over the area of this alleged defect at the time that the plaintiff indicated she was walking there," was "a fact I have to consider."

After hearing counsel's arguments, the court took the matter under submission.  On September 15, 2020, the court filed its written order granting the City's motion for summary judgment, finding the City established the sidewalk offset was trivial as a matter of law, and Nunez failed to present evidence raising a triable issue of material fact.  The court entered judgment in favor of the City on October 30, 2020, and Nunez appealed.

## DISCUSSION

### 1. *Summary judgment and standard of review*

Summary judgment is proper if the papers submitted show there is no triable issue as to any material fact and the moving party is entitled to prevail on a cause of action as a matter of law.  (Code. Civ. Proc., § 437c, subd. (c); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).)  A defendant moving for summary judgment has the initial burden to show the plaintiff cannot establish one or more elements of the challenged cause of action or there is a complete defense to that cause of action.  (Code Civ. Proc., § 437c, subd. (p)(2).)

9

A defendant meets its burden by presenting affirmative evidence that negates an essential element of the plaintiff's claim, or by submitting evidence that demonstrates "the plaintiff does not possess, and cannot reasonably obtain, needed evidence" to prove an essential element of the plaintiff's claim. (*Aguilar*, at p. 855.)

If the defendant makes a sufficient showing, the burden then shifts to the plaintiff to demonstrate a triable issue of material fact exists. (Code Civ. Proc., § 437c, subd. (p)(2).) A triable issue of fact exists if the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion. (*Aguilar*, *supra*, 25 Cal.4th at p. 850.)

On appeal from a summary judgment, we review the record de novo and independently determine whether triable issues of material fact exist. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767; *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334.) We "view the evidence in a light favorable" to the nonmoving party, "resolving any evidentiary doubts or ambiguities" in that party's favor. (*Saelzler*, at p. 768.) We consider all evidence the parties submitted in connection with the motion, except that which the court properly excluded. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.)

## 2.    *The doctrine of trivial defect*

Under the Government Claims Act (§ 810 et seq.) a public entity may be held liable for injuries caused by a dangerous condition on public property. (§§ 830, 835.) A condition is "dangerous" if it "creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which

10

it is reasonably foreseeable that it will be used." (§ 830, subd. (a).) Although generally a question of fact, a property defect is not a dangerous condition as a matter of law if the court determines, "viewing the evidence most favorably to the plaintiff, . . . that the risk created by the condition was of such a minor, trivial or insignificant nature in view of the surrounding circumstances that no reasonable person would conclude that the condition created a substantial risk of injury . . . ." (§ 830.2 & Law Revision Commission Comments; *Fielder v. City of Glendale* (1977) 71 Cal.App.3d 719, 726–727 (*Fielder*); see also *Huckey v. City of Temecula* (2019) 37 Cal.App.5th 1092, 1104–1105 *(Huckey)* [summary judgment proper where reasonable minds could only conclude there was no substantial risk of injury, but court may not find defect trivial as a matter of law where evidence presented shows reasonable minds could differ as to whether defect presents a substantial risk of injury].)

Thus, "a property owner is not liable for damages caused by a minor, trivial, or insignificant defect" on its property. (*Cadam v. Somerset Gardens Townhouse HOA* (2011) 200 Cal.App.4th 383, 388 (*Cadam*).) This principle, referred to as the "trivial defect doctrine" or the " 'trivial defect defense,' " is not an affirmative defense, but "an aspect of duty that a plaintiff must plead and prove." (*Huckey, supra*, 37 Cal.App.5th at p. 1104; *Cadam*, at p. 388.) That is so because a property owner's duty of care "does not require the repair of minor or trivial defects." (*Cadam*, at p. 389; see also *Ursino v. Big Boy Restaurants* (1987) 192 Cal.App.3d 394, 398 (*Ursino*) ["persons who maintain walkways, whether public or private, are not required to maintain them in an absolutely perfect condition"].)

11

In the sidewalk-walkway context, "[t]he decision whether the defect is dangerous as a matter of law does not rest solely on the size of the crack in the walkway, since a tape measure alone cannot be used to determine whether the defect was trivial." (*Caloroso v. Hathaway* (2004) 122 Cal.App.4th 922, 927 (*Caloroso*); see also *Huckey, supra*, 37 Cal.App.5th at p. 1105 ["court should *not* rely solely upon the size of the defect . . . although the defect's size 'may be one of the most relevant factors' to the court's decision"].) Rather, "[a] court should decide whether a defect may be dangerous only after considering all of the circumstances surrounding the accident that might make the defect more dangerous than its size alone would suggest. [Citation.] Aside from the size of the defect, the court should consider whether the walkway had any broken pieces or jagged edges and other conditions of the walkway surrounding the defect, such as whether there was debris, grease or water concealing the defect, as well as whether the accident occurred at night in an unlighted area or some other condition obstructed a pedestrian's view of the defect." (*Caloroso*, at p. 927.) "[T]he plaintiff's knowledge of the area, . . . the weather at the time of the accident, and whether the defect has caused any other accidents," are also factors courts have considered. (*Huckey*, at p. 1105.)

Thus, our analysis of whether the sidewalk defect here is trivial as a matter of law involves two steps. First, we review evidence of the " 'type and size of the defect.' " (*Huckey, supra*, 37 Cal.App.5th at p. 1105.) If that analysis reveals a trivial defect, we then consider " 'evidence of any additional factors [bearing on whether the defect presented a substantial risk of injury]. If these additional factors do not indicate the defect was

12

sufficiently dangerous to a reasonably careful person,' " then we will " 'deem the defect trivial as a matter of law.' " (*Id.* at p. 1105, quoting *Stathoulis v. City of Montebello* (2008) 164 Cal.App.4th 559, 567–568 (*Stathoulis*).)

**3.     *The sidewalk defect was trivial as a matter of law***

The evidence, viewed in the light most favorable to Nunez, shows the height differential between the sidewalk slabs where she tripped was—at its highest point—just under three-quarters of an inch.  Courts consistently have held that—in the absence of aggravating factors—a sidewalk offset of this size (and higher) is a trivial defect as a matter of law.  (*Huckey*, *supra*, 37 Cal.App.5th at p. 1107 [noting "[s]idewalk elevations ranging from three-quarters of an inch to one and one-half inches have generally been held trivial as a matter of law"]; *Cadam, supra*, 200 Cal.App.4th at pp. 385–386 [height differential between three-fourths and seven-eighths of an inch trivial]; *Ursino, supra*, 192 Cal.App.3d at pp. 396–397 [three-quarters of an inch uplift trivial]; *Fielder*, *supra*, 71 Cal.App.3d at pp. 721, 733–734 [three-quarter inch depression a trivial defect]; *Beck v. City of Palo Alto* (1957) 150 Cal.App.2d 39, 43–44 [no liability for sidewalk elevation differential up to one and seven-eighths inch]; *Whiting v. National City* (1937) 9 Cal.2d 163, 165–166 (*Whiting*) [three-quarter inch height differential "minor" defect].)  Accordingly, our " 'preliminary analysis' " of the evidence " 'reveals a trivial defect.' " (*Huckey,* at p. 1105.)

We thus consider evidence of additional factors that bear on whether the offset posed a substantial risk of injury to pedestrians.  (*Huckey, supra*, 37 Cal.App.5th at p. 1105.) The City presented evidence demonstrating there were no aggravating factors when Nunez fell that made the offset here

13

more dangerous than its size posed: it was a sunny, dry morning; the offset between the two adjoining slabs had no jagged edges, debris did not cover the defect, and the sidewalk was free of cracks, holes, loose concrete, liquid, or other defects;[9] and the City had no record of any earlier complaints about accidents involving the offset.

4. ***Nunez's evidence did not demonstrate the offset presented a substantial risk of injury under the circumstances***

Nunez contends she presented evidence from which a jury could infer the offset was obscured from view, making it a substantial risk of injury. She argues the evidence demonstrates the offset—which, according to her expert, was "high enough to cause a trip event, but low enough that it would not be in plain sight"—was obscured from her view by shadows from a nearby tree. That shading, Nunez argues, combined with the color continuity between the two slabs, and her unfamiliarity with the area, presented a triable issue of fact as to whether the sidewalk offset posed a substantial risk of injury. Viewing the sidewalk uplift in the context of the surrounding circumstances (*Kasparian v. AvalonBay Communities, Inc.* (2007) 156 Cal.App.4th 11, 27–28 (*Kasparian*)), we cannot conclude a trier of fact reasonably could conclude the three-quarter inch offset constituted a dangerous condition.

First, we reject Nunez's contention the color of the sidewalk substantially increased the risk that a pedestrian would trip

---

[9] The March 30, 2017 photographs Nunez submitted also show the offset and sidewalk free of these sorts of potentially aggravating factors.

14

on the offset. As the trial court noted, a sidewalk offset by its nature occurs on a surface—sidewalk slabs—that lacks color differentiation. If the color continuity between the sidewalk slabs here could turn an otherwise trivial defect into a dangerous condition, the doctrine—as the City asserts—would be "practically inapplicable to public sidewalks."

In contrast, in *Kasparian*, relied on by Nunez, the court reversed summary judgment where an elderly tenant fell and sustained severe injuries after she tripped over a drain recessed in the ground, at a depth lower than the offset here, along a brick paver walkway in her apartment complex. (*Kasparian, supra*, 156 Cal.App.4th at pp. 14–15.) Although there was no debris on the ground, nothing obstructed the plaintiff's view of the drain, and she fell on a sunny afternoon (*id*. at p. 17), the appellate court concluded plaintiff's expert's testimony presented a triable issue of fact as to the defect's triviality. (*Id*. at pp. 28–30.) The expert testified the hole for the drain grate was uneven—with a height ranging from 1/32 inch to 5/16 inch— and was not flush with the surrounding area brick pavers, while all other drains in the immediate vicinity were flush with the ground. (*Id*. at pp. 28–29.) The slope also was " 'dramatically more severe than that found in customary drains.' " (*Id*. at p. 29.) And, the drain was not distinguishable by color or texture from the surrounding pavers. (*Ibid*.) The expert opined that, as a result, the recessed drain, which a pedestrian would not expect, could not be " 'easily detected even in daylight.' " (*Ibid*.)

Nunez, however, tripped on a sidewalk. As we discussed, in contrast to a drain grate in brick pavers, sidewalk slabs are not expected to have any color or texture differentiation between them. Moreover, as the City notes, Nunez never attested the lack

of color differentiation between the two sidewalk slabs obscured her view of the offset or otherwise contributed to her tripping. She declared only that the sidewalk defect was obscured from her view, "including as a result of shadows." And, at her deposition, Nunez testified only that she did not see the offset as she was "normal walking, . . . looking ahead."

Similarly, Nunez presented no evidence to demonstrate how her lack of familiarity with the sidewalk rendered the otherwise trivial defect in the sidewalk a dangerous condition. In *Stathoulis, supra*, 164 Cal.App.4th at p. 567, on which Nunez relies, the court mentioned courts should consider a "plaintiff's knowledge of the conditions in the area" when analyzing whether circumstances surrounding the fall might have rendered a defect more dangerous. The defect there, however, was unusual— a cluster of three, "irregularly shaped and sizeable holes of about an inch deep flanking one another in the street"—and photographs supported the plaintiff's contention that they contained "loose material." (*Id.* at p. 569.) Those are not the facts here. And, as the trial court found, there is no evidence of other aggravating factors that would make the offset here dangerous when coupled with Nunez's lack of familiarity with that particular sidewalk.

Nunez also seems to argue the very fact she tripped and fell despite her athleticism shows the sidewalk defect here presented a substantial risk for injury. We do not agree. Any defect in a sidewalk might cause someone to injure themselves. (See *Whiting, supra*, 9 Cal.2d at p. 165 ["It is a matter of common knowledge that it is impossible to maintain a sidewalk in a perfect condition. Minor defects are bound to exist. A municipality cannot be expected to maintain the surface of

16

its sidewalks free from all inequalities and from every possible obstruction to travel."].) The trivial defect doctrine exists for that very reason: to "provid[e] a check valve for elimination from the court system of unwarranted litigation which attempts to impose upon a property owner what amounts to absolute liability for injury to persons." (*Ursino, supra*, 192 Cal.App.3d at p. 399.)

Finally, Nunez contends evidence that shadows obscured her visibility of the offset precluded the court from finding the defect trivial as a matter of law, despite its size. The court noted Nunez mentioned the shadows for the first time at summary judgment, but nevertheless considered her argument that they constituted an aggravating factor raising a triable issue as to the dangerous nature of the offset. In rejecting Nunez's contention, the trial court first noted the case law "contemplates aggravating factors more serious than a shadow, standing alone, when finding a defect is non-trivial as a matter of law." We agree.

As the City argues, in circumstances where no other aggravating factors exist, finding the existence of a shadow on an otherwise trivial sidewalk defect creates a dangerous condition effectively would make the City guarantee "the safety of every square inch of its sidewalks." As the City notes, as the sun moves throughout the day, shadows on sidewalks caused by natural sunlight are "ubiquitous" and ever changing. The law does not require a public entity to repair all conditions that might create a possibility of injury, however. (See *Fredette v. City of Long Beach* (1986) 187 Cal.App.3d 122, 130, fn. 5 [condition of property " 'should create a "substantial risk" of injury, for an undue burden would be placed upon public entities if they were responsible for the repair of all conditions creating any possibility

17

of injury however remote that possibility might be' " (quoting 4 Cal. Law Revision Com. Rep. (1963) p. 822)].)

*Caloroso* is instructive. As the City notes, the appellate court there concluded "disputed issues about light and shadow in the circumstances of [that] case [were] immaterial." (*Caloroso, supra*, 122 Cal.App.4th at p. 929.) Similar to Nunez, the plaintiff there, on a sunny, dry, mid-morning day, tripped over a 7/16-inch-high crack in a walkway—about a quarter-inch lower than the offset here. (*Id.* at pp. 925, 929.) The plaintiff, like Nunez, was looking straight ahead when she fell. (*Id.* at p. 925.) And, as here, there was no evidence of previous falls caused by the defect. (*Ibid.*) Much like Burns's testimony, the plaintiff's expert testified the interplay between bright sunlight and shadows, and the shadow from a tree that fell across the crack, making the area dark, contributed to making the walkway a dangerous condition. (*Ibid.*) Although the plaintiff waffled in her testimony about whether the sun affected her vision, the court assumed "that bright, dappled light blinded [the plaintiff's] view of the crack." (*Id.* at p. 929.) Given the trivial nature of the crack, the court concluded the evidence did "not support the conclusion that reasonable minds could differ regarding whether the risk of injury was trivial." (*Ibid.*) Considering the similar circumstances here, we cannot conclude a trier of fact reasonably could find the existence of a shadow over the defect area created a dangerous condition.

In any event, we have examined the photographs in the appellate record of the sidewalk defect and surrounding area. (*Kasparian, supra*, 156 Cal.App.4th at p. 15 ["reviewing court takes a fresh look at the photographs relied upon by the trial court and examines the photographs de novo"].) The photographs

18

of the sidewalk defect show a shadow falling over the highest point of the offset on the far left (west) side where the slabs meet and abut a cement walkway. The entire slab is not in shadows, however. More than half of the slab is in the sunlight. The offset extends past the shadowed area, into the sunlit area, but at a lower height differential.[10]

In the photographs taken at a distance from the defect, we cannot discern the height differential between the slabs where they are shaded by the tree's shadow. But, from that distance, we cannot see the height differential, albeit a smaller one, between the slabs where they are not shaded, either. Accordingly, a fact finder could not reasonably conclude the shadow *decreased* the visibility of the offset to render it more dangerous. Moreover, in photographs taken from a distance closer to the defect, the offset is visible despite being shaded by the shadow. We thus agree with the trial court—the photographs do not demonstrate the offset was *obscured* by shadows—and conclude reasonable minds could not find the shadow made the offset more dangerous than its size would suggest.[11]

5. ***The City's policy to repair sidewalk tripping hazards greater than a half-inch does not create a triable issue as to the triviality of the offset***

Nunez also contends the City undertook a duty to repair sidewalk offsets greater than a half-inch, like this one, which

---

[10] Based on the photographs, the offset measures a half-inch just before the shadow ends.

[11] It also is not clear how the shadow could have obscured Nunez's ability to see the offset given she was looking ahead, not down at the sidewalk, before she tripped.

19

the City considered a tripping hazard.  She argues that because the City admitted the offset here met the criteria for repair under the City's policy, it cannot be said that no reasonable person could find the offset created a substantial risk of injury.  It is undisputed that, had the City seen the offset on the sidewalk before Nunez fell, it would have repaired it.  The City in fact repaired the sidewalk in March 2018 after receiving notice of Nunez's lawsuit.

We cannot agree the City's policy that sidewalk height differentials between a half-inch and one-and-a-half inches should be repaired—in part because they are tripping hazards—renders the nonalignment of the sidewalk slabs here a dangerous condition as contemplated by sections 830 and 830.2.  "It is impossible to maintain heavily traveled surfaces in perfect condition.  Minor defects such as the [nonalignment] in [the City's sidewalk] inevitably occur, and the continued existence of such [nonalignments] without warning or repair is not unreasonable." (*Caloroso, supra*, 122 Cal.App.4th at p. 929.)  Moreover, in the absence of a constitutional requirement, only the legislature can create public entity liability.  (*Cochran v. Herzog Engraving Co.* (1984) 155 Cal.App.3d 405, 409 ["public entities may be liable *only* if a statute declares them to be liable"].)

Nunez nevertheless relies on *Laurenzi v. Vranizan* (1945) 25 Cal.2d 806 (*Laurenzi*) for the proposition that a public entity's determination that a sidewalk defect is hazardous and in need of repair precludes finding the defect trivial as a matter of law.  *Laurenzi* is distinguishable.  There, the California Supreme Court found substantial evidence supported the jury's verdict that the sidewalk defect in that case was a dangerous condition

20

of which the City had constructive notice.  (*Id*. at pp. 810–812.)
The plaintiff in *Laurenzi* fell when he slipped, and his foot
became wedged in a hole in the sidewalk.  (*Id*. at pp. 807–808.)
The hole was significantly larger than the offset here—up to
two and a half inches deep, two inches wide at one end and up to
six inches wide at the other end, and a foot long.  (*Id*. at p. 811.)
Moreover, contrary to the conditions here, at the time the
plaintiff in *Laurenzi* fell, it was dark and only one light lit
the area; the sidewalk was wet with carrot top debris scattered
over it; and vegetable crates were stacked on either side of
the hole.  (*Id*. at p. 808.)  The city inspector, who did not notice
the hole during his inspection, testified that, if he had seen a
condition like the one described and photographed, he would have
considered it hazardous and repaired it.  (*Id*. at pp. 811–812.)
Based on that evidence, the court concluded, "it cannot be said
as a matter of law that the defect was such a minor defect to be
insufficient to impose liability upon the city." (*Id*. at p. 812.)

The *Laurenzi* court did not hold, however, that the city's
admission that a particular defect may be dangerous creates
a triable issue of fact as to whether an otherwise trivial defect
constitutes a dangerous condition.  There, the evidence supported
finding the defect was likely to cause substantial injury:  it was
a large hole, obstructed from view.  In contrast to two inches,
the height differential here was at most three-quarters of an
inch.  And, none of the aggravating factors present in *Laurenzi*
were present here:  Nunez fell in mid-morning, on a sunny day;
the sidewalk was dry with no debris covering the defect; and
the defect was not obscured from view as Nunez approached it.

The height differential here posed *some* risk of injury;
despite her athleticism, Nunez suffered significant injuries when

21

she tripped on it.  And, the evidence, viewed in the light most favorable to Nunez, supports a reasonable inference that height differentials greater than a half-inch pose a tripping hazard to walkers.  But, the City does not have a duty to protect pedestrians from every sidewalk defect that might pose a tripping hazard—only those defects that create a *substantial* risk of injury to a pedestrian using reasonable care.  (See *Huckey, supra*, 37 Cal.App.5th at pp. 1109–110 [height differential "posed *some* risk of injury" and evidence supported inference that height differentials like the one at issue posed a tripping hazard, but "to constitute a dangerous condition, the height differential, and the area surrounding it, must have posed 'a substantial . . . risk of injury' "].)  Indeed, in the cases we have cited where the court concluded a defect was trivial as a matter of law, the complaining plaintiff was injured.  Accordingly, although the City may have thought offsets of the size here posed a tripping hazard, the evidence does not support finding the defect posed a substantial risk of injury.

The trial court did not err in finding the sidewalk offset was trivial as a matter of law and no aggravating factors created a triable issue as to whether the offset created a substantial risk of injury at the time Nunez fell.[12]

---

[12]    We thus need not address the City's contentions that the trial court should have sustained its objection to Nunez's declaration about shadows, and that, because Nunez did not amend her complaint to allege shadows, color differentiation, or her unfamiliarity with the area were aggravating factors in her fall, we should disregard her argument about those factors. We also need not consider Nunez's contention that a material dispute exists as to whether the City had notice of the defect.

## DISPOSITION

The judgment is affirmed.  Respondent the City of Redondo Beach is to recover its costs on appeal.

**CERTIFIED FOR PARTIAL PUBLICATION**


EGERTON, J.

We concur:



LAVIN, Acting P. J.



KIM, J.[*]

---

Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.